## FISHBACK et al. vs. WEAVER et al., Ad. Ex.

1. **SPECIAL JUDGES:** *Special adjourned courts.*

   If the regular judge is not present to take the bench, at the commencement of an adjourned term of the court, if necessary, it would be his duty, or the clerk's, to certify to the bar his inability to hold the court. They should then proceed to elect a special judge for general business, who would, perhaps, supersede a special judge elected at the regular term for special business. Where this is not done, the presumption arises from the record that the regular judge was present.

   A decree rendered at an adjourned term, by a special judge elected at the regular term, is a judicial act from which an appeal lies.

2. **DECREE IN REM:** *When superseded by appeal without bond.*

   A decree for the sale of land, against several defendants, is superseded by an appeal without bond, if any of the appellants are administrators, or executors, having an interest in the land.

3. **SALES PENDING APPEAL:** *Title of purchaser.*

   When a decree for the sale of property is reversed in the supreme court, all the rights acquired by parties to the suit as purchasers of the property under the decree, fall with the reversal of the decree and dismissal of the bill. They do not stand upon the same equities with strangers who purchase under an order, still valid, and pay valuable consideration.

4. **SUBROGATION:** *Surety voluntarily paying bond.*

   A surety who has paid money for a guardian, which the guardian owed upon his bond, and which the surety is bound to make good, is not obliged to wait for judgment or execution, but, by paying without them, undertakes the burden of showing that he was actually bound to pay. Showing that, he has the right to pay at once, and be subrogated to all the securities which the creditors or beneficiaries in the bond has, and to all securities put into the hands of his co-sureties, even though intended to indemnify the latter alone, except such as he has consented to be given to them to his exclusion.

APPEAL from *Sebastian* Circuit Court in Chancery.
Hon. JAMES BRIZZOLARA, Special Judge.
*Gallagher & Newton, Du Val & Cravens,* for appellant.
*Garland, Benjamin, contra.*

EAKIN, J.  George S. Birnie, the intestate of appellees, became co-surety with Nicholas Spring, in a bond of William H. Norton, for $4,000, given by him as guardian of Mary Jane Miller, one of the minor heirs of Joseph Miller, deceased.    The bond was filed in the Crawford county probate court, after due approval at the January term, 1851.

Norton had married the widow of Joseph Miller, and was also appointed guardian, separately, of seven other minor children of said Miller, giving a bond in each case.

Spring became alarmed at the mismanagement and imprudent habits of Norton, and demanded indemnity ; whereupon Norton, on the third of June, 1853, executed to him a mortgage of four lots in Fort Smith, which was filed for record on the twenty-sixth of the following July. It was properly conditioned to save Spring harmless against any loss on account of his suretyship on the bond given by Norton, as guardian of Mary Jane.

Afterwards, on the nineteenth of December, 1853, Norton executed a second mortgage of the same property in favor of J. R. Kannady.

Afterwards the  eight children and heirs of Joseph Miller, being still minors, including Mary Jane, brought a joint suit in chancery against their guardian, Norton, and many other defendants supposed to be interested in the subject matters, including said Birnie, Spring and Kannady.   In the course of this suit, which was pending many years, one of the heirs died without issue, reducing

the number to seven. The others reached full age. Mary Jane intermarried with Hightower, Adeline with Fishback, and other female heirs with others unnecessary to mention. All their husbands were duly made parties. A final decree was rendered at the October term, 1867, of the Sebastian circuit court, by which the lots in question were ordered to be sold, and a commissioner was appointed for the purpose. All the defendants appealed, but no supersedeas was obtained. Some of the defendants had been made parties to the suit during its progress, as administrators of original parties deceased; but what interest they claimed for their respective estates, in said lots, is not clearly shown.

Pending the appeal, the commissioner proceeded to sell the lands under the decree. The pleadings admit, on both sides, that he sold, amongst other property, the lots in controversy, although they are not included in the deed exhibited; and that they were purchased by William M. Fishback and Louis Miller, who—the latter in his own right, and the former in right of his wife—were amongst the parties complainant in the cause appealed. There is no evidence that any formal report was made of such sale to the court, or confirmation of it, save by inference. The commissioner's deed, reciting the facts, was acknowledged in open court, and the acknowledgment ordered to be indorsed. The disposition made by the court of the proceeds of the sale does not appear.

Afterwards, in January, 1868, the decree of the chancellor was, by this court, reversed and set aside, and the court below was ordered to dismiss the bill for want of jurisdiction. See *Norton et al. v. Miller et al., 25 Ark., 108.*

On the fifteenth of August, 1868, Birnie filed the

original bill in this case against Norton, the guardian, Spring, his (complainant's) co-surety, Mary Jane Hightower, the former ward, Fishback and Louis Miller, the purchasers; Kannady, the second mortgagee, and others claiming interests in, or liens upon, said lot. The object and prayer of the bill is to obtain subrogation to the benefits of the mortgage given upon said lots by Norton to Spring, his co-surety; and to annul the purchase made by Fishback and Louis Miller. He sets up in detail the foregoing facts, and bases his claim to subrogation upon the following allegations, to-wit:

That on the sixth of May, 1868, he paid off to Hightower and wife, and wholly discharged the amount due them from Norton—" the balance due them at that time being nine hundred dollars; said William H. Hightower and wife having previously received of and from your orator the sum of twenty-five hundred dollars, making in all the sum of three thousand, three hundred dollars, in full payment and satisfaction of the said guardian bond;" and alleging further, that upon the receipt of said nine hundred dollars, Hightower and wife executed to complainant and Spring a full and entire release from all liability on the guardian bond. Their receipt is exhibited. It is for the sum of nine hundred dollars, and has no allusion to prior payments. It expresses entire satisfaction of all claims on the guardian's bond of Norton, in which Birnie and Spring were sureties, and contained an express assignment to Birnie of all their rights against the guardian on his bond, and their rights under the mortgage given by Norton to Spring.

At the May term, 1870, Fishback and Louis Miller answered the bill. They say that the bond, as guardian of Mary Jane, although given separately by Norton, was

in truth one of eight; although intended to secure his faithful conduct as guardian of the eight children and heirs of Joseph Miller, that the property came into his hands in mass, and was managed together. This point will not be further noticed, as the decision in the case of Norton v. Miller (*supra*) to the contrary, is the law of the case. The bonds are to be separately considered, as if given by several guardians.

They insisted that the appeal in the former case only operated as a supersedeas, so far as the decree affected the appellants, who were administrators; and that the effect of the joint appeal by all the defendants without supersedeas was to leave the decree free to be enforced against Norton, Spring and the complainant, who were parties, and gave no bond; and that, therefore, their purchase under said decree was valid, and extinguished the right of the mortgagee, Spring, under whom the subrogation was sought. They say further that the mandate was never filed below, nor was the suit formally dismissed.

They say that any payments made by complainant to Hightower and wife, of which they deny all knowledge, were voluntary; and deny the right of said parties to release the guardian on said bond beyond their interest in it of one-seventh, which remained after the death, without issue, of one of the heirs. The latter point fails, of course, under the former decision. The bond was exclusively for the protection of Mary Jane Hightower.

Afterwards, complainant filed an amended bill, containing more specific charges with regard to other liens, and clouds upon the title, but not materially varying the aspect of the case, or the relief sought against appellants, Fishback and Miller. To the amended bill, the said appellants demurred.

On the thirty-first of July, 1877, the regular circuit judge being disqualified to sit in this and many other cases pending in the Sebastian circuit court, a special judge was elected to try said causes; and afterwards the regular judge adjourned the court until the first Monday in December. On the day last named the court convened, the special judge presiding, and proceeded to business. On the twenty-fourth of December, the decree in this cause was made, reciting that it had been submitted before the adjournment. The court overruled the demurrer of Fishback and Miller to the amended bill. They declined to plead further, and the cause was heard upon the "bill, answer, exhibits and proof." The court found as a fact, that on the twenty-sixth of July, 1862, said Birnie had paid on said bond, in full satisfaction thereof, $1,200, and on the sixth day of May, 1868, the further sum of $900—in all, $2,100, "which was due and owing from the said Norton, as guardian," and is now due the administrators of Birnie, who had died pending the suit. For the payment of this, they were held entitled to subrogation, and the commissioner's deed to Fishback and Miller was set aside. A decree for $2,100 was rendered against Norton, with the usual orders for foreclosure of the mortgage by sale, in case of non-payment.

An appeal was granted by the clerk of this court to Fishback, Louis Miller and other defendants.

It is necessary first to determine whether any final decree has been rendered in the case by a competent court. Appellants contend that the Hon. Special Judge Brizzolara had no power to open and hold a special term of the court, in the absence of the regular judge; and that all the proceedings after the adjournment of the regular August term, 1877, on the first of September, were *coram non judice*, and

void. If this be so, the case still stands in the circuit court of Sebastian, continued over by operation of law, in the status it had on said first of September.

It was held in *Dunn v. State, 2 Ark., 230,* that it was a power incident to all courts, to adjourn their sittings to a distant day; and that the proceedings, at the adjourned session, will be considered, as the proceedings of the same term.

*Sec. 28 of chapter 43 of the Revised Statutes, approved in 1838,* authorized the holding by any court of *special adjourned sessions, in continuation of the regular term,* "upon its being so ordered by the court or judges in term time ; and entered by the clerk on the record of the court."

The act of the sixth of April, 1869, section 1, provided that: "Every circuit court shall continue in session, at each and every term thereof, until the business therein pending is disposed of, or until it becomes necessary for the judge thereof to adjourn the same, in order to reach the court next to be holden in his circuit."

The constitution of 1874 left it to the legislature to prescribe the times and places of holding the terms of the circuit courts (*Art. VII, sec. 12*), and continued in force all laws upon the subject not in conflict with any of its provisions (*Schedule to same, sec. 1*). Generally, in the provisional arrangements for the circuits, made by the constitution, the times for the beginning of the terms in all the courts were fixed, but no limit was fixed for their duration. The sixth circuit was in some respects exceptional in this regard; but that does not affect the general system, nor touch this question now before us. *Art. XVIII.*

The act of March 8, 1877, creating the Twelfth circuit, provided that the court should be held in the Fort Smith district, on the last Monday in February and July ; and in

the Greenwood district on the fifth Mondays, respectively, after those above designated. (*Pamph. Acts of 1877, p. 41*). The record shows that the circuit court was in regular session at Fort Smith on the thirty-first day of July, 1877, which the court judicially knows was on Tuesday, the day after that fixed by law for the beginning of the term. It will be presumed that the court was regularly opened. The judge gave notice to the bar of his disqualification to preside in a number of cases, including this, and the said special judge was duly elected for those cases. He made an order in this case on the twenty-eighth of August, 1878. Afterwards, on the first of September, which the court knows was on Saturday, preceding the court for the Greenwood district, the regular judge adjourned the court until the first Monday in December, 1877. This he had the right to do. He had fulfilled his duty in holding the court for the Fort Smith district, until it became necessary to leave for the Greenwood district. He might then have adjourned the court until the next term, if he had chosen to do so. But he had still the power to adjourn it to a day near or distant.

On the first Monday in December following, it was as proper for the court to be in session, in continuation of the business of the term, as if it had only adjourned over for two days, for a local holiday, or public convenience. We must not lose sight of the distinction between "special adjourned sessions" of the circuit court, and "special terms." The latter, without any adjournment for the purpose, might, between terms, be held by the judge, for the special purpose of trying persons confined in jail. For this purpose, certain notices were prescribed, and certain formalities requisite. (See *chap. 43, Rev. Stat., secs. 29 to 34.*) These terms were not continuations of the foregoing regular

terms. They were separate and independent. It was held in *Brown v. Fleming, 3 Ark., 284,* that a special judge for certain cases, in which the regular judge might be disqualified, could not hold one of these special terms. "The law," it was said, " contemplated that the special judge would attend at the regular term of the court, as less inconvenient to the community." The court, in that case, said : "It does not appear to have been at, or during the continuance of, the regular term; nor at a special session to which the circuit court had been adjourned by any previous order of the court, or of the judge." This is a plain intimation of the view taken of the difference taken between " an adjourned session," and a " special term," and also of the opinion that there would be no objection to a special judge presiding, at any time, during the continuance of an adjourned session.

The forms and modes of proceeding between the regular and special judges of all courts are dictated generally by judicial courtesy, convenience, mutual respect and a decent regard for the dignity of the tribunal. None are presented by law. To constitute a valid court, it suffices for the record to show that there was a body in session at the time and place prescribed by law, with legal officers, and held by an authorized judge, presiding therein. (*Dunn v. State, 2 Ark., 253*). Where the judge is elected for special cases only, and the regular judge is presumed to be present, it is the more orderly and better practice for the latter to open the court each day, attend to such general business as may be of immediate importance on morning motions, and then give place to the special judge, at some agreed time. But the observance of this rule is not essential to the validity of the proceedings.

We are called upon, in this case, to inquire into the

37

power of a special judge to open the court at an adjourned session, and proceed with the business, in the absence of the regular judge. If the regular judge had not been in attendance, to have taken the bench, if necessary, it would have been his duty, or the clerk's, to have certified to the bar his inability to hold the court. They might then, and should, have proceeded to elect another special judge for general business, who might, perhaps, have superseded the special judge, elected for special business. As this was not done, the presumption arises, from the record, that the regular judge was there. The maxim applies: " *Omnia præsumunter rite et solemniter esse acta, donec probitur in contrarium.*" Besides, the record does show that on the day this decree was made he vacated the bench to give place to the special judge.

The circuit court had regularly, in term time, appointed an adjourned session, in continuation of the term. Upon the day fixed, we find the court again in session, presided over by a judge duly authorized to sit therein. We find the court continued by successive adjournments till the day of this decree, upon which day we find the regular judge actually presiding, and yielding the bench to the special judge who pronounced it. We think it a judicial act, from which an appeal lies.

This is a direct proceeding to attack and set aside the commissioner's sale, made, under order of the chancery court, upon a decree in a former case, after said decree had been appealed without bond for supersedeas. It must be determined whether, under the particular circumstances, the sale must stand. An appeal, in chancery, formerly, by the English practice, operated as a supersedeas, or not, within the discretion of the chancellor, who, in its exercise, was governed by the circumstances of the case. Upon

that practice our statute, at an early day, engrafted the following provision :

" The appeal, when the appellant is not an executor, administrator, or guardian, suing or sued, shall not operate so as to stay the proceedings, unless a recognizance be entered into before the supreme or circuit court, or a judge thereof, and filed in the office of the clerk of the circuit court." (*Revised Stat., chap. 23, sec. 139.*) This was the law at the time of the sale; and, by inference, the appeal did operate as a supersedeas in the reserved cases.

There were administrators, appellants in that case. What their interest was in the property to be sold is not made clearly apparent, but that they had some, is to be inferred from the facts. They were made parties for some purpose; they were dissatisfied and appealed. As to them and their interest in the land, the decree was superseded under the statute. The decree was a whole, and ought not to have been executed, when no clear title could be made by the sale, barring the future claims of all parties to the suit. Chancery is averse to relief by piecemeal, leaving matters open for future litigation, which appertains to the case before it, and which, by proper delay, may be all settled at once. There could be no adequate price obtained on such sale. The purchaser would buy a lawsuit. Perhaps, in the case of a money decree, where each defendant was personally liable for the whole, a supersedeas by some appellants, or a saving instead of it, might not have been held available for the others, but that question does not arise now. In a proceeding *in rem*, there can be no such division of interests.

The court is further of opinion that if the sale had not been superseded as to the appellants, who were not administrators, all the rights acquired by parties to the suit,

as purchasers, fell with the reversal of the decree and the dismissal of the bill. They do not stand upon the same equities with strangers who purchase under an order, still valid, and pay valuable consideration. The parties are bound to follow the case to this court, and are bound by the decree here, as fully as they were bound by the decree below. The decree in this court annulled the decree below, which forms the basis of their title, and restored the former status of the property. If they have any equities in following any portion of the purchase money, they are not set up in this proceeding. *McBain v. Same, 15 Ohio St., p. 337*, and cases cited by Judge Waite.

As to the complainant's right of subrogation, there can be no question, so far as it appears that he paid money for the guardian, which the guardian owed on the bond, and which the complainant was under obligation to make good. He was not obliged to wait for judgment or execution; but, by paying without them, undertook the burden of showing that he was actually bound to pay. Showing that, he had the right to pay at once, and be subrogated to all the securities which the creditors or beneficiaries in the bond had, as well as to all the securities put into the hands of his co-surety, even though intended to indemnify the latter alone, except such securities as he had contracted or consented, might be so given to his exclusion. The right of subrogation does not arise from contract, though it may be defeated by it. It is the machinery adopted by courts of justice to enforce fair dealing towards those secondarily bound for a debt, not only against principals and creditors, but amongst co-sureties themselves. The latter must share with each other every plank in the shipwreck. They are under mutual trusts towards each other, and for each

other's protection, to do all in their power to avert or diminish the common liability.

It is distinctly alleged, not specifically denied, shown by the receipt, and found by the court, that Birnie paid Hightower and wife $900, which *Norton owed on the bond.* If Norton owed it, the subrogation *pro tanto* was right.

The bill further alleges that Birnie had previously paid for Norton on the bond about $2,400, but does not sufficiently allege that Norton properly *owed* that on the bond, or show that Birnie was bound to pay it. The surety has no right to pay out money for his principal by way of compromise, or otherwise, which the principal may not actually owe on the debt—and the surety may not have been bound to pay. This might be unjust, and no right to subrogation can be based upon it. The answer says these payments were voluntary, and the receipt of Hightower and wife does not allude to them. The chancellor found that $1,200 had been so paid, for which Birnie (or his administrator) was entitled to subrogation, making $2,100 in all. We find nothing in the record to justify that conclusion. If the record had left any room to suppose that any oral testimony had been used, or that there had been any agreement of counsel concerning facts, we might well have presumed that the finding of the chancellor had sufficient support. But no such presumption can be entertained. The cause was heard upon "the bill, answer, exhibits, *and proof filed herein.*" All these should be in the record, and we find nothing there that satisfies us, with reasonable certainty, that Birnie was bound under the bond to pay for Norton any of the sums which he paid Hightower and wife for Norton, in discharge of the bond previous to the $900. It may, for aught that appears, have been an officious interference, or the result of unnecessary alarm.

The decree is for too great an amount, and, therefore, erroneous. It should, on the pleadings and proof, have been only for $900, with interest. For this error, reverse the decree, and remand the cause, with leave to parties to amend the pleading, and take further proof; and for further proceeding, consistent with equity and this opinion.

NOTE.—At a subsequent day the appellee asked leave to file a *remittitur*—remitting all the decree except as to the sum of $900, with interest, and releasing all claim on the supersedeas bond, and agreeing to pay the costs of this court—which was allowed; whereupon, the decree was affirmed as to $900 and interest, not remitted.